# Frank Freedman, Isaac Freedman and Morris Freedman, trading as Freedman Brothers, Appellees, v. Erie Railroad Company, Appellant.

## Gen. No. 31,732.

1. CARRIERS—*prima facie evidence of damage to goods in transit.* A shipper makes a prima facie case by showing the goods were delivered to the carrier in marketable condition and were received at the delivery point in deteriorated condition.

2. CARRIERS—*burden of proof to rebut prima facie evidence of damage to goods.* After a shipper has made a prima facie case by proving the carrier received the goods in marketable condition and delivered them in damaged condition, the burden is cast on the carrier to show its own due care and that the damage did not result from its fault.

3. CARRIERS—*burden of proof of terminal carrier where goods damaged in transit.* After a shipper has made a prima facie case by proving the carrier received the goods in marketable condition and delivered them damaged, the terminal carrier, being presumed to have received the shipment in good condition, has the same burden as the initial carrier to show that it used reasonable diligence in handling the shipment.

4. CARRIERS—*liability of connecting carriers under Carmack Amendment.* Under the Carmack Amendment to the Interstate Commerce Act, the bill of lading required to be issued by the initial carrier upon an interstate shipment, so far as valid under the act, governs the entire transportation and fixes the obligations of all connecting carriers.

5. CARRIERS—*what relieves connecting carrier from bearing shipper's loss.* A connecting carrier will be relieved of liability for damage to a shipment shown to have been received by the initial carrier in good condition, if the connecting carrier can show that the damage occurred before it received the shipment.

6. CARRIERS—*necessity of connecting carriers overcoming prima facie case.* Unless connecting carriers can show that a shipment was damaged before they received it, each of them has the burden of overcoming a prima facie case by the shipper of the shipment being delivered in good condition and received in damaged condition.

7. CARRIERS—*presumption that connecting carriers received shipment in good order.* Upon evidence showing that an initial carrier received a shipment in good order, the law will presume that all successive connecting carriers also received the shipment in good order.

8. EVIDENCE—*hypothetical question usurping province of court.* An objection was properly sustained to a hypothetical question, the answer to which would have been an opinion of an ultimate fact which the court itself was called upon to decide.

Appeal by defendant from the Municipal Court of Chicago; the Hon. JOHN J. ROONEY, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1927. Affirmed. Opinion filed November 23, 1927. Rehearing denied December 9, 1927.

FOLLANSBEE, SHOREY & SCHUPP, for appellant; CLYDE E. SHOREY and LOUIS W. BECKER, JR., of counsel.

H. C. LUST, for appellees.

MR. JUSTICE WILSON delivered the opinion of the court.

This is an appeal from a judgment of the municipal court of Chicago in favor of the plaintiffs below, in the sum of $458, for damages sustained by plaintiffs by reason of damage to a certain shipment of grapes.

The facts show that on November 23, 1923, a car of grapes, commonly known as Emperors, was shipped from Madera, California, under a bill of lading (plaintiffs' exhibit 1) issued by the Southern Pacific Company, and billed to Chicago, Illinois. This car was redirected to Newark, New Jersey, where it arrived December 5, 1923. The car from Chicago to Newark was under the control and direction of the defendant company. It was known as a refrigerator car and was supposed to be iced from time to time during the course of shipment, in order to keep the grapes or whatever perishable articles might be contained therein, from deteriorating by reason of weather conditions.

A number of witnesses have testified on both sides in the cause, but it would appear that at the time the grapes left California they were in good condition. Certain witnesses who were present at the time they were crated and placed in the car for shipment testified as to this fact, and certain other witnesses testified

that upon their arrival in Newark, New Jersey, they were in a bad state and damaged by reason of decay. From the testimony, it appears that they left California in good or fair condition and that they reached Newark in such condition that a large percentage of the shipment was deteriorated and damaged. Aside from the oral testimony of the witnesses, the court is somewhat governed in its opinion by the two exhibits jointly introduced by both parties to the suit, the first being joint exhibit 1—a copy of the certificate of inspection of the United States Department of Agriculture, made at Madera, which stated that approximately 6 per cent were sunburned and immature, but that the remainder of the stock was of good quality and with no decay. The other exhibit, being Moorehead's inspection certificate, showing the condition of the car and its contents on its delivery at Newark, described the grapes as a fair or good grading, but that most lugs showed from 25 to 30 per cent mould at the time of the inspection. The testimony of the defendant consisted mostly of showing that from the time the car was received at the clearing yard at Chicago, by the defendant company until its arrival in Newark, it was inspected at various points in transit and was iced at Marion, Ohio, December 2nd and again at Hornell, New York. Various witnesses on behalf of the defendant testified that the seals were unbroken throughout the trip; that the car appeared to be in proper condition, and the temperature was taken from time to time, most of which testimony was made by reference to records kept at the time and in the course of their employment. This court is not impressed with the argument that grapes are inherently subject to decay. The purpose of refrigeration is to stay this inherent tendency, and there was no unusual delay in shipment.

On the other hand, one Wagman, testifying for the plaintiff below, stated that he examined the condition of the car at the time it was opened on its arrival at

Newark, and that in that particular car there were two or three layers broken and that the grapes were thrown around; that there was a bracing up to the ceiling and one part of the ceiling was gone. Louis Freedman, a witness on behalf of the plaintiffs, testified that he examined the condition of the car on December 5; that he climbed to the top of the tiers, and that strips were taken off the top and lugs were taken out from the next layer; and that the grapes at that time were decayed and mouldy. It appears that these grapes were packed in lugs, which were evidently wooden receptacles, each containing a certain number of grapes; and these lugs were placed in tiers in the cars, and were supposed to be kept in place by uprights.

The goods were shipped, as stated, under what is known as the uniform straight bill of lading issued by the Southern Pacific Company; dated November 23, 1923; from A. J. Sturtevant, Jr., shipper, and consigned to the National Auction Co., Inc., at Chicago. It states in its body that the goods were properly described in the bill of lading and were received in apparent good order. The grapes in question were what are known as juice grapes, and not of the finest quality but of a kind that is generally included in the late shipments from California; it being the custom to make shipments of grapes of the kind and character in question, as late as this and often later.

From the testimony contained in this record we are forced to the conclusion that at the time the grapes were shipped, they were in fair, marketable condition, and at the time of their arrival in Newark they had deteriorated by reason of mould and decay. Such being the facts in the case, it follows, as a matter of law that a prima facie case results in favor of the shipper, and the burden of showing due care is cast upon the carrier, and that the condition resulted without fault on its part.

Some testimony was introduced on behalf of the carrier, to the effect that grapes decayed rapidly if there was any evidence of decay at the time they were shipped.   But, in view of the report of the United States Department of Agriculture, as stated in joint exhibit 1, there was no decay apparent in the grapes in question at the time they left Madera.   The Erie Railroad was not the initial carrier in this case but what is known as a terminal carrier; but the terminal carrier is presumed to have received the shipment in good condition, and the same burden is cast upon the terminal carrier, in regard to a showing of reasonable diligence and care in the handling of the shipment. The defendant in this case relies upon the fact that there is no evidence of negligence on its part, as a carrier, and that, consequently, the prima facie case is rebutted.   On the other hand plaintiff below contends that it is the duty of the terminal carrier, after it has been shown that damage has resulted, to show that it, the carrier, was not the cause of the condition, and in order to save itself from liability, it must show that the damage resulted from some other cause than the care exercised by the terminal carrier in transporting the goods.

The Carmack Amendment to the Interstate Commerce Act (c 2591, sec. 20, 34 Stat. 593, 595; c 176, 38 Stat. 1196) fixes the responsibility for a shipment on the initial carrier, for any loss or damage occurring during the course of shipment, whether over its own line or lines of any connecting carriers.   But, by the interpretation of the Supreme Court of the United States, the contract between the shipper and the initial carrier fixes the obligation of all participating carriers, under and by virtue of the terms of the bill of lading.   The United States Supreme Court in its opinion in the case of *Georgia, F. & A. Ry. Co. v. Blish Milling Co.*, 241 U. S. 190, at page 194, says:

"The connecting carrier is not relieved from lia-

bility by the Carmack amendment, but the bill of lading required to be issued by the initial carrier upon an interstate shipment governs the entire transportation and thus fixes the obligations of all participating carriers to the extent that the terms of the bill of lading are applicable and valid. 'The liability of any carrier in the route over which the articles were routed, for loss or damage, is that imposed by the act as measured by the original contract of shipment so far as it is valid under the act.' "

In other words, the responsibility of connecting carriers is that of agents for the initial carrier receiving shipments from that carrier, and each of the carriers is liable for loss or damage to goods shipped over its particular line during the course of the shipment. If it should develop in the course of a hearing that the loss occurred on a line, prior to its receipt by the connecting carrier, and this could be definitely shown, the connecting carrier would be relieved of responsibility. In the absence of such proof, the prima facie case remains as to each one of the connecting carriers, until this prima facie case is defeated by proof on the part of the carrier.

In the case of *Cassone v. New York, N. H. & H. River R. Co.*, 100 Conn. 262, 123 Atl. 280, a shipment of grapes from California left the point of origin, September 10, 1920, arrived at Maybrook, New York, September 28, and arrived at Stanford, Connecticut, on September 30. It appears that the grapes were decayed and deteriorated, but the court in its opinion found that it was in the hands of the terminal carrier, the defendant in that case, but a few hours, and consequently, under the circumstances, it would be impossible for the deterioration to have taken place within such a short period of time. Moreover, in that case the shipment did not call for icing, so that there were other causes than the care of the carrier involved, but the court in its opinion recognizes the liability of a terminal carrier under

circumstances which might raise a question of liability. In the case at bar the shipment was in the hands of the defendant carrier from Chicago to Newark, New Jersey, for a period of four or five days, and under the circumstances, it appearing that the initial carrier received the goods in good order, the law would presume that each successive carrier also received them in good order. *Trott v. Baltimore & O. R. Co.*, 192 Ill. App. 239. The court, in the *Trott* case, *supra*, at page 243, says:

"When the initial carrier receives goods in good order, the law presumes that each successive carrier, intermediate between the initial and last carrier, receives them in good order; and this presumption, working through to the last carrier who delivers them in bad order, casts the burden upon it to prove that it provided all suitable means of transportation and exercised that degree of care which the nature of the goods required, or to prove that the damage occurred before it received the goods (*St. Louis I. M. & S. R. R. Co. v. Coolidge, supra;* (73 Ark. 112, 114); *Ruddell v. Baltimore & O. R. R. Co.*, 175 Ill. App. 456, 457), and this presumption is equally applicable to the next preceding carrier where it is shown that the damage did not occur or could not have occurred while the goods were in the possession of the last carrier."

The Supreme Court of the United States in the case of *The Folmina*, 212 U. S. 354, at page 361, says:

"It was long since settled in *Clark v. Barnwell*, 12 How. 272, that where goods are received in good order on board of a vessel under a bill of lading agreeing to deliver them, at the termination of the voyage, in like good order and condition, and the goods are damaged on the voyage, in a proceeding to recover for the breach of the contract of affreightment, after the amount of damage has been established, the burden lies upon the carrier to show that it was occasioned by one of the perils for which he was not responsible.

In the case of *Oregon-Washington Railroad & Navi-*

*gation Co. v. McGinn,* 258 U. S. 409, the court found, as a matter of fact, that the damage to the shipment of horses. involved in that transaction, occurred prior to the time of the receipt of the shipment by the railroad company.

We are of the opinion that the question involved in the case at bar is one purely of fact. On the one hand, as stated hereinbefore, the grapes were received in good condition, with no evidence of decay, so that we assume that if any such resulted it must necessarily follow that it started and occurred after the grapes were in transit. There is some evidence on behalf of the plaintiff below that the ceiling of the car was in bad shape upon its examination at Newark by the witness for the plaintiff. This, coupled with the legal presumption, constitutes a case which it became necessary for the railroad company to overcome and which it attempted to do by showing that it had exercised proper diligence in handling the shipment. The one outstanding fact appears to be that the grapes were in good condition when shipped and were in bad condition when received at Newark, and the trial court was of the opinion that the prima facie case, coupled with such evidence as was introduced by plaintiff below, was not overcome by the testimony of the defendant, and we see no reason for disturbing its finding.

An objection is made to the fact that the trial court sustained an objection to an hypothetical question propounded to one of defendant's witnesses, but the hypothetical question was one, the answer to which would have involved the final decision of the cause and was, in fact, an opinion on an ultimate fact which was a fact which the court was itself called upon to decide, and we believe the objection was properly sustained by the trial court.

For the reasons given in this opinion, the judgment of the municipal court is affirmed.

*Judgment affirmed.*

TAYLOR, P. J., and HOLDOM, J., concur.